UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TIMOTHY J. HARGRAVE,

            Plaintiff,

        v.

UNIVERSITY OF WASHINGTON, et al.,

            Defendants.

CASE NO. C14-0376JLR

ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Before the court are Defendants' motion for summary judgment (Def. MSJ (Dkt. # 33)) and Plaintiff's motion for partial summary judgment (Plf. MSJ (Dkt. # 42)).  This case arises because Defendant University of Washington ("the University") denied Plaintiff Timothy Hargrave tenure and a promotion to associate professor.  Having considered the submissions of the parties, the balance of the record, and the relevant law,

//

ORDER- 1

1  and having heard oral argument, the court grants Defendants' motion for summary

2  judgment and denies Plaintiff's motion for summary judgment.

3                              **II.   BACKGROUND**

4          Dr. Hargrave is an organizational sociologist who worked as an assistant professor

5  at the University's Bothell School of Business from 2006 to 2012.  (*See* Dkt. # 34-3 at

6  73-87 ("Hargrave CV"); Gautschi Decl. (Dkt. # 63) Ex. 14 ("2012 Statement").)  Dr.

7  Hargrave has sued the University for age, race, and national origin discrimination, and

8  has sued five University employees for aiding and abetting the University's sex, age,

9  race, and national origin discrimination.  (Am. Compl. (Dkt. # 12).)  The individual

10 defendants are Susan Jeffords, Vice Chancellor for Academic Affairs; Sandeep

11 Krishnamurthy, Dean of the Bothell School of Business, and three tenured Bothell School

12 of Business ("the Business School") faculty members, P.V. Balakrishnan, Gowri

13 Shankar, and Pradyot Sen.[1]  (*Id.*)  The facts are as follows.

14 **A.   Tenure Criteria**

15         The University's Faculty Code establishes the general criteria for obtaining tenure

16 and for being promoted to associate professor.[2]  Specifically, the Faculty Code provides:

17         Tenure should be granted to faculty members of such scholarly and
           professional character and qualifications that the University, so far as its
18         resources permit, can justifiably undertake to employ them for the rest of

19 ─────────────────────

20         [1] Dr. Hargrave previously dismissed Defendants Cheryl Cameron, Vice Provost for Academic
    Personnel, and Dr. James Miller, a tenured Business School faculty member, from the suit.  (Stip.
    Dismissal (Dkt. # 90).)

21         [2] As in Dr. Hargrave's situation, the two processes often occur concurrently.  (*See* Dkt. # 34-3 at
22 48 (Business School guidelines listing the same criteria for both).)

ORDER- 2

1   their academic careers.  Such a policy requires that the granting of tenure be
    considered very carefully.  It should be a specific act, even more significant
2   than promotion in academic rank, which is exercised only after careful
    consideration of the candidate's scholarly and professional character and
3   qualifications.

4   (Peterson Decl. (Dkt. # 34) Exs. A, B, H ("Faculty Code") § 25-41.)  With respect to

5   promotion, "[a]ppointment to the rank of associate professor requires a record of

6   substantial success in both teaching and research, except that in unusual cases an

7   outstanding record in one of these activities may be considered sufficient."  (*Id.* § 24-34.)

8   The considerations relevant to evaluating a candidate's scholarly and professional

9   qualifications are "scholarship and research, teaching, and service."  (*Id.* § 24-32.)

10          The Business School has adopted guidelines further elucidating the application of

11  the University's tenure and promotion standards to Business School faculty.  (Peterson

12  Decl. Ex. D ("Shankar Dep.") at 29:13-32:24; Dkt. # 34-3 at 48 ("Tenure Guidelines")

13  (listing "Criteria for Promotion and Tenure").)  The Business School criteria state that

14  "[t]he candidate for tenure and promotion to the rank of Associate Professor must show

15  promise of attaining a national reputation."  (*Id.*)  Although "a number of different types

16  of scholarly contributions are valued," the Business School requires that "there must be a

17  base of publications in high-quality refereed journals."  (*Id.*)

18          The Business School's tenure review process consists of multiple stages.  (Faculty

19  Code at 4-5.)  To begin, the candidate prepares an extensive dossier of his or her

20  professional accomplishments, which can consist of hundreds of pages.  (Peterson Decl.

21  Ex. I ("Krishnamurthy Dep.") at 17:2-15; Faculty Code § 24-54; Krishnamurthy Decl.

22  (Dkt. # 37) ¶ 7.)  The candidate is responsible for making her best case for tenure.

1    (*See* Peterson Decl. Ex. E ("Cauce Dep.") at 27:7-10; Hargrave Dep. at 209:3-9; Faculty

2    Code § 24-54.)  The candidate's dossier is first evaluated by a "Promotion and Tenure

3    Committee" ("P&T Committee"), which consists of three tenured professors, two of

4    whom are from the candidate's department.  (Faculty Code § 24-54; Peterson Decl. Ex. F

5    ("Jeffords Dep.") at 11:1-25.)  The P&T Committee also solicits at least four letters of

6    review from scholars external to the University in the candidate's field.  (Holland Dep. at

7    15:14-16:5.)  Those reviewers provide an outside perspective on the candidate's

8    scholarship.  (*Id.*; *see also* Dkt. # 34-3 at 71-72 (sample external review letter).)  The

9    P&T Committee makes a recommendation to the senior faculty of the candidate's

10   department, who then vote.  (Faculty Code § 24-54; Jeffords Dep. at 11:1-25.)  The dean

11   of the department writes a report summarizing the vote and the faculty proceedings, as

12   well as making an independent recommendation regarding tenure.  (Faculty Code § 24-

13   54; Jeffords Dep. at 11:1-25.)  At this time, the candidate has an opportunity to provide

14   additional input in response to the report.  (Peterson Decl. Ex. G ("Cameron Dep.") at

15   19:19-20-22.)  The dean provides his or her report and recommendation to the Campus

16   Council on Promotion, Tenure, and Faculty ("Campus Council"), which consists of six

17   faculty elected from academic units across the campus.  (Faculty Code § 24-54; Jeffords

18   Dep. at 11:1-25.)  The Campus Council reviews the preceding faculty process to ensure it

19   was fair, and make an independent recommendation regarding tenure.  (Faculty Code

20   § 24-54; Jeffords Dep. at 11:1-25.)  The materials are then reviewed by the Vice

21   Chancellor for the campus, who makes a recommendation to the Chancellor.  (Faculty

22   Code § 24-54; Jeffords Dep. at 11:1-25.)  After reviewing the materials, the Chancellor

1   makes a recommendation to the Provost.  (Faculty Code § 24-54; Jeffords Dep. at 11:1-

2   25.)  The Provost makes an independent recommendation to the President, who

3   ultimately decides whether to award tenure.  (Faculty Code § 24-54; Jeffords Dep. at

4   11:1-25.)

5   **B.    Dr. Hargrave's Tenure Reviews**

6          Dr. Hargrave underwent his first tenure review process in 2011-12.

7   (Krishnamurthy Decl. at 2; Cameron Decl. (Dkt. # 36) at 2.)  At the time, his curriculum

8   vitae included only four scholarly publications:  (1) a co-authored article published in

9   *Academy of Management Review* in 2006 ("the AMR article"); (2) a single-authored

10  article published in the *Business Ethics Quarterly*, published in 2009 ("the Business

11  Quarterly article"), and (3) two co-authored book chapters, published in 2004 and 2009.

12  (*See* Nye Decl. (Dkt. # 56) ¶¶ 7-9.)  In addition, in 2011, Dr. Hargrave had two potential

13  papers pending review at other journals, namely, *Academy of Management Journal* and

14  *Organizational Science.*  (*See* Gautschi Decl. (Dkt. # 63) Ex. 2 ("2011 External

15  Reviews").)

16         The co-authored articles and chapters were authored in conjunction with his

17  dissertation chair, Dr. Van de Ven.  (Nye Decl. ¶¶ 7-9.; Van de Ven Decl. (Dkt. # 59)

18  ¶¶ 5-7.)  It is undisputed that the AMR article, which was published in a top management

19  journal, has been influential and frequently cited in the field of institutional theory.  (*See,*

20  *e.g.*, Laverty Decl. (Dkt. # 57) ¶ 8; Gautschi Decl. Ex. 5 ("Collins Dep.") at 3:14-23

21  (P&T committee member explaining, "[W]e thought it was a seminal piece."); Peterson

22  Decl. Ex. 15 ("2011 Dean Rec."); Hargrave Dep. at 89:1-7.)  Two of Dr. Hargrave's five

1   external reviewers mentioned the impact of the AMR article.  (*See, e.g.*, 2011 External

2   Reviews. at 17 ("The 2006 AMR paper is simply outstanding and has made a major

3   impact on the field.").)  In general, the reviewers recommended awarding Dr. Hargrave

4   tenure.  (*See generally* 2011 External Reviews.)

5         After reviewing Dr. Hargrave's dossier and external review letters, the P&T

6   Committee recommended promotion and tenure.  (Gautschi Decl. (Dkt. # 63) Ex. 10

7   ("2011 P&T").)  The P&T Committee acknowledged the "question of whether [Dr.

8   Hargrave] had a sufficient number of publications to warrant P&T."  (*Id.*)  Nonetheless,

9   the Committee concluded that "the quality, reputation, and future promise of Tim's

10  publications outweigh any questions regarding the volume of his work to date."  (*Id.*)

11        The seven senior faculty members, however, were divided:  three voted in favor of

12  promotion, three opposed, and one abstained.  (Peterson Decl. Ex. 15 ("2011 Dean

13  Rec.").)  Dean Krisnamurthy's letter to Dr. Hargrave explained, "While some faculty

14  members noted the quality and impact of your research, a significant subset of the senior

15  faculty believed that your published research output was below the average expected and

16  did not indicate "'substantial success' . . . in research."  (Peterson Decl. Ex. 11 ("2011

17  Letter") at 1.)  The voting senior faculty members included defendants Dean

18  Krishnamurthy, Dr. Shankar, and Dr. Balakrishnan.  (Laverty Decl. ¶ 14.)  Dr. Laverty

19  testifies that, at the faculty tenure meeting, those defendants argued strenuously against

20  granting tenure to Dr. Hargrave.  (*Id.*)

21        Dean Krishnamurthy individually recommended against promotion and tenure.

22  (2011 Dean Rec.)  In his recommendation, he expressed concerns about Dr. Hargrave's

1   "publication trajectory," the quality of the work in his research pipeline, and his reliance

2   on his former dissertation advisor as a research partner.  (*Id.*)

3     The Campus Council, however, voted unanimously in favor of awarding tenure.

4   (Peterson Decl. Ex. 13 ("2011 Council Rec.")  The Campus Council concluded that the

5   review process to that point had been "thorough, fair, and in full accordance with

6   [University] procedures."  (*Id.*)

7     Confronted with the faculty's divided opinions, Vice Chancellor Jeffords

8   recommended that Hargrave's tenure decision be postponed for a year, in order to give

9   Dr. Hargrave time to address the deficiencies identified in his research record.  (Peterson

10  Decl. Ex. 50 ("2011 Chancellor Letter").)  The Chancellor concurred.  (*Id.*)

11    The Provost and current Interim President, Ms. Ana Marie Cauce, also agreed to

12  postpone Dr. Hargrave's tenure decision for one year.[3]  (Cauce Dep. at 5:17-7:4.)  The

13  Provost was concerned that Dr. Hargrave's "publication record was . . . not strong."  (*Id.*

14  at 21:4-23.)  She noted both the limited quantity of publications and the declining quality:

15  his first and best paper had come during his time as a graduate student working with his

16  dissertation advisor.  (*Id.* at 21:4-23:4.)

17    Dr. Hargrave's tenure review the following year fared worse.  In the meantime, his

18  two papers pending review had not been published:  one had been withdrawn, and the

19  other was rejected.  (Peterson Ex. 31 ("2012 Dean Rec.") at 1; Hargrave Dep. at 83:13-

20

21  ───────────────────

22    [3] The Campus Council members, the Chancellor, and the Provost are not defendants in this suit.
Dr. Hargrave admits that the Campus Council did not discriminate against him when reviewing his tenure
application.  (Hargrave Dep. at 169:9-12.)

15, 87:4-20, 89:11-22.)  Dr. Hargrave had managed to publish one new article in a lower

ranked journal, *Business and Society Review.* (Hargrave Dep. at 95:20-25.)  It is

undisputed that the *Business and Science Review* is the lowest quality of the journals in

which Dr. Hargrave was published.  (*Id.*)  Dr. Hargrave's failure to publish caused one

external reviewer to change his recommendation from awarding to denying tenure;

however, other external reviewers continued to support Dr. Hargrave's candidacy.  (*Id.*;

Gautschi Decl. Ex. 6 ("2012 Reviews") at 59, 64-65.)

In the 2012-13 review, a different P&T Committee again recommended tenure.

(Peterson Decl. Ex. L ("Sen Dep.") at 57:1-11.)  This time, however, the senior Business

School faculty voted four against tenure, three in favor of tenure, and one abstaining.

(2012 Dean Rec. at 1.)  Dr. Krishnamurthy's letter to Dr. Hargrave explained that the

faculty had found a "low research output with significant gaps and . . . a systemic

downward trend in quality."  (Peterson Ex. 64 ("2012 Letter").)

The faculty members present included Dean Krishnamurthy, Dr. Balakrishnan, Dr.

Shankar, and Dr. Sen.  (Laverty Decl. ¶¶ 12-13.)  Dr. Laverty and Dr. Nye testify that, at

the faculty tenure meeting, those defendants argued strenuously against granting tenure to

Dr. Hargrave.  (*Id.*; Lye Decl. (Dkt. # 56) ¶¶ 7, 9.)  Dr. Hargrave's written response to the

vote was added to his dossier.  (Krishnamurthy Decl. ¶ 4; 2012 Statement.)

Dean Krishnamurthy again recommended against tenure and promotion, citing Dr.

Hargrave's recent setbacks in the publication process.  (2012 Dean Rec.)  The Campus

Council changed its recommendation to denying tenure.  (Peterson Ex. 18 ("2012 Council

Rec.") ("Despite early success with a high impact publication, the record indicates that

Dr. Hargrave has yet to establish a substantial research program independent of his research advisor and commensurate with the expectations of the [Business School].") .) So did Vice Chancellor Jeffords and the Chancellor.  (Peterson Ex. 51 ("2012 Chancellor Letter").)  After reviewing the materials, the Provost decided to deny tenure.  (Cauce Dep. at 29:16-32:6.)  She found that, in the intervening year, Dr. Hargrave had not achieved the academic success necessary to earn tenure.  (*Id.*)

After Dr. Hargrave was denied tenure, he commenced an internal administrative appeal against Dean Krishnamurthy, Vice Chancellor Jeffords, Vice Provost Cameron, and Provost Cauce.  (*See* 2d Gautschi Decl. (Dkt. # 67) Ex. 2 ("Petition"); Faculty Code § 28.)  He argued that the respondents failed to comply with the Faculty Code when they denied his tenure application.  (Petition.)  The Chair of the University's Adjudication Panel found that, although the Panel could not reconsider Dr. Hargrave's entitlement to promotion and tenure on the merits, it could determine whether the decision was affected by factors other than the relevant and permissible considerations to a tenure decision.  (Cameron Decl. Ex. D ("Chair Letter").)  The Chair also determined that the Panel would "clearly" have the authority to direct the University to conduct another tenure review that complied with the University's requirements.  (*Id.*)  Nonetheless, after receiving unfavorable preliminary discovery rulings from the Panel, Dr. Hargrave voluntarily withdrew his appeal.  (Cameron Decl. Ex. C ("Withdrawal Letter").)

Dr. Hargrave also filed a claim with the Equal Employment and Opportunity Commission ("EEOC"), alleging discrimination on the basis of race and age, but not

*//*

national origin or sex.  (Cameron Decl. Ex. A ("EEOC Charge.").)  The EEOC, however, dismissed his charges.  (*Id.* Ex. B.)

Dr. Hargrave then initiated this lawsuit.  Dr. Hargrave brings the following claims against the following defendants:

- The University:  Discrimination on the basis of race and national origin[4] in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"); Discrimination on the basis of age, race, and national origin in violation of the Washington Law Against Discrimination ("WLAD"), RCW 49.60.180; Breach of contract;

- Dr. Krishnamurthy, Dr. Balakrishnan, and Dr. Shankar:  Aiding and abetting discrimination on the basis of sex, age, race, and national origin in violation of WLAD, RCW 49.60.220;

- Ms. Jeffords:  Aiding and abetting discrimination on the basis of age, race, and national origin in violation of WLAD, RCW 49.60.220;

- Dr. Sen:  Aiding and abetting discrimination on the basis of sex in violation of WLAD, RCW 49.60.220.

---

[4] Dr. Hargrave admits that he cannot bring a Title VII sex discrimination claim against the University because he did not include an allegation of sex discrimination in his EEOC complaint.  (Resp. to MIL (Dkt. # 92) at 4; *see also* EEOC Charge); *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (holding that plaintiffs are required to exhaust administrative remedies by filing a timely charge with the EEOC before initiating litigation).  The parties dispute whether Dr. Hargrave's national origin Title VII claim is barred because he did not allege national origin discrimination in his EEOC charge.  (*See* Def. Mot. at 37 n.24); *see* EEOC Charge.  The court notes that "[e]ven when an employee seeks judicial relief for claims not listed in the original EEOC charge, the complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge."  *Freeman*, 291 F.3d at 636.  Because it is undisputed that Dr. Hargrave can raise a national origin discrimination claim under the WLAD (Def. Mot. at 37 n.24), the court finds it unnecessary to decide the issue for purposes of this order.

1   (Am. Compl. (Dkt. # 12).)  Defendants have moved for summary judgment on all claims.

2   (Def. Mot.)  Plaintiff has moved for partial summary judgment on his breach of contract

3   claim against the University.  (Plf. Mot.)  Those motions are now before the court.

### III.   ANALYSIS

**A.   Summary Judgment Standard**

6          Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

7   where the moving party demonstrates (1) the absence of a genuine issue of material fact

8   and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

9   317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

10  moving party bears the initial burden of showing the absence of a genuine issue of

11  material fact.  *Celotex*, 477 U.S. at 323.

12         If the moving party does not bear the ultimate burden of persuasion at trial, it can

13  show the absence of an issue of material fact in two ways:  (1) by producing evidence

14  negating an essential element of the nonmoving party's case, or (2) by showing that the

15  nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan*

16  *Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

17         If the moving party meets its burden of production, the burden then shifts to the

18  nonmoving party to identify specific facts from which a factfinder could reasonably find

19  in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby,*

20  *Inc.*, 477 U.S. 242, 252 (1986).  In determining whether the fact finder could reasonably

21  find in the nonmoving party's favor, "the court must draw all reasonable inferences in

22  //

favor of the nonmoving party, and it may not make credibility determinations or weigh

the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**B.   Discrimination Claims**

   **1.   Legal framework**

Dr. Hargrave's state and federal discrimination claims are all evaluated under the

standard applicable to federal Title VII claims. *See Scrivener v. Clark Coll.*, 334 P.3d

541, 544 (Wash. 2014) (stating that the federal standard for evaluating Title VII claims

applies to WLAD claims); *Hegwine v. Longview Fibre Co.*, 172 P.3d 688, 696 (Wash.

2007) (same); *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wash. 2d 355, 361-62, 753

P.2d 517, 520 (Wash. 1988) (same).  In general, an employer is liable under Title VII if a

plaintiff's race, religion, sex, or national origin was either the sole reason or motivating

factor for the employer's decision not to promote the plaintiff.  *Costa v. Desert Palace,*

*Inc.*, 539 U.S. 90, 101-02 (2003); *see also Dominguez-Curry v. Nevada Transp. Dep't*,

424 F.3d 1027, 1040-41 (9th Cir. 2005); 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B).

In their summary judgment briefing, both parties rely on the burden-shifting

*McDonnell Douglas* approach to Title VII claims.  (*See* Def. Mot.; Plf. Resp.); *see also*

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Under this approach, a

plaintiff may establish a prima facie case of a violation of Title VII by introducing either

direct or indirect evidence that an employer discriminated against him or her on an

impermissible basis.  *Mondero v. Salt River Project*, 400 F.3d 1207, 1211 (9th Cir. 2005);

*Lynn v. Regents of Univ. of Calif.*, 656 F.2d 1337, 1340 (9th Cir. 1981).  "The burden of

establishing a prima facie case is not onerous."  *Lynn*, 656 F.2d at 1340.  To establish a

prima face case by indirect evidence, a plaintiff "must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *See also Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115, 1123-24 (9th Cir. 2000).

A prima facie case "raises an inference of discrimination." *Lynn*, 656 F.2d at 1344. To dispel the adverse inference, the employer need only "articulate some legitimate, non-discriminatory reason for the employee's rejection." *Id.* If the employer articulates such a reason, the burden shifts to the plaintiff to show that the reason was "a pretext or discriminatory in its application." *Id.* at 1345.

A plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence" because it is inconsistent or otherwise not believable. *Chuang*, 225 F.3d at 1123-24; *Mondero*, 400 F.3d at 1213; *see also Dominguez-Curry*, 424 F.3d at 1037. "Generally, there are three types of evidence that can be used to show pretext: (1) direct evidence of discrimination, such as discriminatory statements or admissions, (2) comparative evidence, and (3) statistics." *Penk v. Or. State Bd. of Higher Educ.*, 816 F.2d 458, 462 (9th Cir. 1987). A "reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). If a plaintiff raises a genuine issue of fact with respect to pretext, summary judgment is inappropriate. *See Mondero*, 400 F.3d at 1213

ORDER- 13

### 2. Application to Dr. Hargrave's claims

For purposes of this motion, Defendants do not contest Dr. Hargrave's assertion that he can establish a prima facie case of discrimination by indirect evidence.[5] (*See* Def. Mot. at 25; Plf. Resp. at 33-36.)  Instead, the University asserts that it properly declined to award tenure to Dr. Hargrave on the basis that his scholarship was deficient.  (Def. Mot. at 25 ("The University did not award tenure to Dr. Hargrave because it concluded he had not met the high standards to earn that distinction, focusing particularly on his research record.").  "Without doubt, deficient scholarship is a legitimate, nondiscriminatory reason to deny . . . tenure."  *Lynn*, 656 F.2d at 1344; *Dominguez-Curry*, 424 F.3d at 1037.  Accordingly, the burden shifts to Dr. Hargrave to show that the University's explanation is "inconsistent or otherwise not believable."  *Dominguez-Curry*, 424 F.3d at 1037.

Dr. Hargrave relies almost entirely on comparative evidence to show pretext.  (Plf. Resp. (Dkt. # 54) at 36-37.)  He claims that his academic record surpassed those of three similarly situated professors who were recently granted tenure at the Bothell School of

---

[5] Dr. Hargrave's contention that he has put forth direct evidence is incorrect.  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption."  *Coghlan v. Am. Seafoods Co. L.L.C.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (internal punctuation omitted).  Direct evidence "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."  *Dominguez-Curry*, 424 F.3d at 1038 (quoting *Coghlan*, 413 F.3d at 1095).  Dr. Hargrave, however, has admitted that he is unable to recall any specific instance in which any of the faculty made discriminatory remarks or treated him in a discriminatory fashion.  (Hargrave Dep. at 69:7-71:2.)  Dr. Hargrave insists that statements the faculty made concerning the future "trajectory" of his research constitute age discrimination, because older candidates presumably have a shorter future in which to establish a trajectory.  (Plf. Resp. at 33.)  That contention is misguided.  Such remarks are not clearly ageist or otherwise discriminatory.  *See Dominguez-Curry*, 424 F.3d at 1038.  Therefore, the court concludes that Dr. Hargrave has failed to put forth direct evidence of discrimination.

1   Business.[6]  Out of concern for the comparators' privacy, the parties have agreed to refer

2   to them as Dr. A, Dr. B, and Dr. C.  (*Id.*)  Their qualifications are as follows.

3       Dr. A, a native of Colombia, was granted tenure in 2012.  (Gautschi Decl. Ex. 8

4   ("Comparator CVs"); Dean Comp. Letters (Dkt. # 76) at 11 (letters from the Dean to

5   Vice Chancellor Jeffords summarizing the faculty vote on each comparator and making a

6   recommendation); VC Comp. Letters (Dkt. # 41-1) (letters from Vice Chancellor Jeffords

7   to the Provost addressing each comparator's tenure application.).)  At the start of his

8   review process in 2011, he had published three papers; by 2012, he had published two

9   more.  (*See* Cameron Decl. Ex. D (email telling the Provost about the recent

10  publications); Comparator CVs; Dean Comp. Letters.)  The Business School faculty

11  voted 7-0 in favor of tenure, and the Dean recommended tenure.  (*Id.*)

12      Dr. C, a native of India, was hired as an associate professor in 2013 and granted

13  tenure in 2014.  (VC Comp. Letters; Dean Comp. Letter.)  At the time of his tenure

14  review, he had published six scholarly articles in peer-reviewed journals, three in the

15  previous five years.  (*Id.*)  The Business School faculty voted four to zero in favor of

16  tenure, and the Dean recommended tenure.  (Dean Comp. Letters.)

17      Dr. B, a Caucasian female, went through tenure review in 2012-13.  (Dean Comp.

18  Letters.)  At the time of her review, she had four publications, with five manuscripts

19  ───────────────

20      [6] Generally, a showing that an employer treated similarly situated employees outside the
    plaintiff's protected class more favorably is probative of pretext.  *Vasquez v. Cnty. of L.A.*, 349 F.3d 634,
21  641 (9th Cir. 2003), *as amended* (Jan. 2, 2004).  The comparators must be similarly situated "in all
    material respects."  *Moran v. Selig,* 447 F.3d 748, 755 (9th Cir.2006).  In other words, individuals "are
    similarly situated when they have similar jobs and display similar conduct."  *Vasquez*, 349 F.3d at 641.
22  For the purposes of this motion, Defendants do not challenge Dr. Hargrave's contention that the three
    professors he identified are adequate comparators.  (*See generally* Plf. Mot.)

1    currently under review.  (*See* Comparator CVs.)  The Business School faculty, however,

2    voted nine in favor of tenure (with one abstaining), and the Dean recommended tenure.

3    (Dean Comp. Letter.)  The Council and Chancellor, however, voted against granting

4    tenure due to concern over the paucity of her scholarly publications.  (Cameron Decl. ¶ 8;

5    VC Comp. Letters.)  Dr. B's tenure decision, like Dr. Hargrave's, was postponed for one

6    year. [7]  (*Id.*)

7         Dr. A and Dr. B are approximately 10 years younger than Dr. Hargrave; Dr. C is 3

8    years older.  (*See* Comparator CVs; Hargrave CV.)

9         For their part, Defendants contend that they are entitled to the "same-actor

10   inference" because Drs. Krishnamurthy, Balakrishnan, and Shankar were faculty at the

11   Business School when Dr. Hargrave was initially hired, as well as when he was

12   reappointed for a second three-year term.  (Def. Mot. at 10.)  "Where the same actor is

13   responsible for both the hiring and the firing of a discrimination plaintiff, and both

14   actions occur within a short period of time, a strong inference arises that there was no

15   discriminatory motive."  *Schechner v. KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012)

16   (quoting *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270-71 (9th Cir.1996).)  The

17   same-actor inference is "a 'strong inference' that a court must take into account on a

18   summary judgment motion."  *Id.* (quoting *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090,

19   1098 (9th Cir. 2005)).  A case should go to the jury only if a "plaintiff can muster the

20   //

21   _____

22       [7] Dr. B has since resigned from the University.  (Cameron Decl. ¶ 8.)

ORDER- 16

1  extraordinarily strong showing of discrimination necessary to defeat the same-actor

2  inference." *Coghlan*, 413 F.3d at 1097.

3      The court finds that the same-actor inference is inapplicable here for the following

4  reasons:  Drs. Krishnamurthy, Balakrishnan, and Shankar were not the only faculty

5  involved in the hiring, reappointment, and firing decisions; there is no indication how

6  Drs. Krishnamurthy, Balakrishnan, and Shankar voted during the hiring and

7  reappointment decisions; the positive and adverse employment decisions were separated

8  by at least three, and up to six, years, and the record shows that the faculty involved in

9  the two decisions likely changed over six intervening years.  *See Coburn v. PN II, Inc.*,

10 372 F. App'x 796, 799 (9th Cir. 2010) (finding a district court erred in applying the

11 same-actor inference because multiple people were involved in both the positive and

12 adverse employment decisions and the decisions occurred two years apart).  Therefore,

13 the court does not apply an inference in favor of Defendants when considering the motion

14 for summary judgment.  *See Coghlan*, 413 F.3d at 1098.

15      **a.  Improper Evidence**

16      Before turning to the parties' substantive arguments regarding the comparators'

17 qualifications, the court addresses Defendants' objections to certain of Dr. Hargrave's

18 evidence.  Specifically, Defendants object to Dr. Hargrave's attempt to supplement the

19 record with accomplishments that occurred after the tenure decisions, as well as to Dr.

20 Hargrave's reliance on information not before the faculty at the time of the tenure

21 decisions.  (Def. Reply (Dkt. # 69) at 5.)  Accordingly, the court clarifies the type of

22 evidence on which Dr. Hargrave may rely to show superior qualifications.

The purpose of considering evidence of candidates' relative credentials is to determine whether the employer's decision is explainable only (or only in part) by discrimination:  the greater the disparity, the more likely the employer's explanation is pretext.  *Raad*, 323 F.3d at 1197 ("[T]he fact that an employer hired a far less qualified person than the plaintiff naturally gives rise to an inference that the non-discriminatory explanation offered by the employer is pretextual."); *see also Shelley v. Geren*, 666 F.3d 599, 617-18 (9th Cir. 2012) (Bybee, J., dissenting) ("[The standard] must be that a reasonable jury could think that there is such a disparity in their qualifications that the choosing of [the comparator] over [the plaintiff] is only explainable because of the differences in their age.").  The question is not which candidate was more qualified in the abstract, but rather whether the employer's judgment was swayed by something other than permissible criteria.  *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (confirming that courts do not sit as "Super-Tenure Review Committees").  Accordingly, information unknown to (or unknowable by) an employer has no bearing on the question of the employer's motives for an employment decision.

For that reason, the court will not consider Dr. Hargrave's evidence regarding the articles he published subsequent to the tenure decision.  (*See* Hargrave Decl. ¶¶ 4-6.) Neither will the court consider evidence regarding the number of citations his previously published articles have received since the tenure decision.[8]  (*See* Gautschi Decl. ¶¶ 4-6.)

_____

[8] The court will, however, consider the evidence Dr. Hargrave put forth in his dossier showing the number of citations his articles has received up to the date of the tenure review process.  (*See* 2d. Krishnamurthy Decl. (Dkt. # 53) Exs. A, B; 2012 Statement.)

1    Finally, the court will not consider the testimony by Mr. Van de Ven, Dr. Hargrave's

2    dissertation advisor, offering an opinion on Dr. Hargrave's scholarly independence.  (*See*

3    Van De Ven Decl. ¶¶ 5-7.)  This information was not before the tenure review personnel

4    at the time of the tenure decision, and as such cannot be used to impugn their motives.

5    Moreover, Dr. Hargrave was well aware that it is the candidate's responsibility to make

6    his best case for tenure in his dossier.  (*See* Peterson Decl. Ex. E ("Cauce Dep.") at 17:7-

7    10; Hargrave Dep. at 209:3-9; Faculty Code § 24-54.)  He may not use this suit as an

8    opportunity to rectify deficiencies in his original materials.  Therefore, the court strikes

9    that evidence from the record.

10          Dr. Hargrave also relies on a website called Google Scholar to provide current

11   citation counts for his comparators' articles.  (Gautschi Decl. ¶ 3.)  As explained above, a

12   factfinder may consider such information only to the extent it was before the tenure

13   review faculty.[9]  Dr. Hargrave puts forth evidence that the Business School faculty

14   discussed the "low citation rates" of Dr. A during their tenure meeting.  (Last Gautschi

15   Decl. (Dkt. # 93) Ex. 5 ("Collins Dep.") at 28:7-30:8.)  There is, however, no indication

16   that the faculty were aware of the other comparators' citation information at the time of

17   their decisions.  (*See id.* (explaining that professors do "not routinely" take it upon

18

19          [9]Defendants raise other evidentiary objections to Dr. Hargrave's Google Scholar evidence.
20   (Reply at 2-3.)  This evidence takes the form of a declaration by Dr. Hargrave's attorney, Mr. Gautschi,
     self-reporting the results he has observed on the Google Scholar website. (Gautschi Decl. at ¶¶ 3-6.)  Dr.
     Hargrave, however, admits he does not know how Google Scholar counts citations, what publications
21   Google Scholar considers, whether there is any quality assurance program, and why Google Scholar
     citation counts differ from other citation indexes.  (Hargrave Dep. 246:1-248:11.)  Because the court does
     not rely on the Google Scholar evidence for deciding this motion, the court does not address Defendants'
22   other evidentiary objections.

ORDER- 19

1   themselves to look up the citation rates of a candidate's papers); Comparator CVs; 2d.

2   Peterson Decl. (Dkt. # 47) Ex. D ("Holland Dep.") at 24:1-23 (testifying that not all

3   candidates provide citation information in their dossiers and that committee members do

4   not do independent research regarding citation information); Cameron Dep. at 37:5-12

5   (same); Balakrishnan Dep. at 46:25-47:18 (same); Gautschi Decl. Ex. 11 ("Shankar

6   Dep.") at 14:7-25 (testifying that he is unaware of the citation count of his colleagues);

7   Hargrave Dep. at 243:8-11, 244:10-13 (conceding that the Business School has not

8   adopted citation counts as a standard to use in decision making).)  Therefore, the court

9   strikes Dr. Hargrave's comparator citation evidence as to Drs. B and C, and does not

10  consider it for purposes of this summary judgment motion.  The court notes that, because

11  Dr. Hargrave propounds ample other evidence on the subject of citations, this evidentiary

12  ruling should work little prejudice to him.  (*See* Levarty Decl. ¶ 8 (finding Dr. Hargrave's

13  citations to be uncharacteristically numerous for a tenure candidate); 2011 Letter

14  (acknowledging that the Dr. Hargrave had amassed a volume of citations "unusual" for a

15  person at that point in his career); Collins Dep. at 13:1-14:21 (discussing how an external

16  reviewer's comment that "very few researchers in [the field of organizational science]

17  can claim to have a paper with 165 citations at the time they go up for tenure" influenced

18  the P&T Committee).)

19      With respect to the final evidentiary issue, the court finds that Dr. Hargrave's

20  evidence regarding the academic rankings of the journals in which he and the

21  comparators published articles is relevant.  (*See* Gautschi Decl. Ex. 3 ("Rankings")

22  (Thomson Reuters Jounal Citation Reports (2013) rankings).)  This specific evidence

1   may not have been before the tenure decisionmakers.  (*See* 2011 External Reviews; *see*

2   2d Krishnamurthy Decl. (Dkt. # 53) Ex. A ("2011 Dossier"), Ex. B ("2012 Dossier"), Ex.

3   C ("2011 Response") (Hargrave's 2011 response to the Business School faculty vote),

4   Ex. D ("2012 Response") (Dr. Hargrave's 2012 response to the Business School faculty

5   vote); Cauce Dep. at 26:15-27:10 (testifying that it is up to the candidate to make the case

6   for the quality of journals in which they have been published, and that some do identify

7   the top journals in their fields).  However, the faculty have testified that individual

8   professors rely on their knowledge, experience, and judgment as scholars to determine

9   the quality of a particular publication or article.  (Holland Dep. 50:14-21;Krishnamurthy

10  Dep. 34:3-16, 53:22-54:12; Sen Dep. 14:16-15:15; Balakrishnan Dep. 10:13-11:2, 65:6-

11  66:13.)  The court concurs that the Business School faculty can be expected to have a

12  general knowledge of the relative prestige of peer-reviewed business journals.  Indeed,

13  the faculty expressed opinions as to the relative quality of Dr. Hargrave's and his

14  comparators' journals when making their tenure decisions.  (*See, e.g.*, 2011 P&T; 2011

15  Letter; 2012 Dean Rec.; Dean Comp. Letters at 9, 13.)  Dr. Hargrave is entitled to

16  challenge their assessments of the quality of his publications.[10]  Therefore, the court will

17  consider Dr. Hargrave's ranking evidence.

18      **b.  Dr. Hargrave's qualifications**

19      With that task aside, the court turns to the parties' substantive arguments regarding

20  Dr. Hargrave's qualifications.  As the Ninth Circuit has emphasized, "academic tenure

21  

22  _____

[10] In so holding, the court does not rule on the admissibility of the evidence in the form in which it is currently presented for summary judgment.  *See* Fed. R. Civ. P. 56(c)(2).

ORDER- 21

1   decisions involve subjective judgments on scholarship that neither courts nor juries are

2   well qualified to make." *Elsayed Mukhtar v. Calif. State Univ., Hayward*, 299 F.3d 1053,

3   1067 (9th Cir. 2002) *amended sub nom. Mukhtar v. Calif. State Univ., Hayward*, 319

4   F.3d 1073 (9th Cir. 2003) *overruled on unrelated grounds by Estate of Barabin v.

5   AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014).[11]   For that reason, evidence regarding

6   academic qualifications, standing alone, is insufficient to prove pretext unless the

7   plaintiff was "clearly superior" to his comparators.  *Raad v. Fairbanks N. Star Borough

8   Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) *opinion amended on denial of reh'g*, No.

9   00-35999, 2003 WL 21027351 (9th Cir. May 8, 2003); *see also Ash v. Tyson Foods, Inc.,*

10  546 U.S. 454, 458 (2006); *Shelley*, 666 F.3d at 610.  However, a plaintiff need not show

11  she was "clearly superior" if, "considering the evidence as a whole, there are . . . other

12  bases upon which a trier of fact could infer pretext."  *Raad*, 323 F.3d at 1194; *Gibson v.

13  King Cnty.*, 256 F. App'x 39, 41 (9th Cir. 2007).

14        The court reviews the parties' evidence with that standard in mind.  The parties

15  have submitted hundreds of pages of evidence and argument addressing the relative

16  qualifications of Dr. Hargrave and his comparators.  (*See generally* Dkt.)  What it boils

17  _____

18        [11] *See also Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005) ("We are mindful of the
      singular nature of academic decision-making, and we lack the expertise to evaluate tenure decisions or to
19    pass on the merits of a candidate's scholarship."); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225
      (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should
20    show great respect for the faculty's professional judgment."); *Adams v. Trustees of the Univ. of N.C.-
      Wilmington*, 640 F.3d 550, 557 (4th Cir. 2011) ("Unsure how to evaluate the requirements for
21    appointment, reappointment and tenure, and reluctant to interfere with the subjective and scholarly
      judgments which are involved, the courts have refused to impose their judgment as to whether the
      aggrieved academician should have been awarded the desired appointment or promotion.  Rather, the
      courts review has been narrowly directed as to whether the appointment or promotion was denied because
22    of a discriminatory reason.").

1   down to is this:  Dr. Hargrave contends that the quality of the articles he had published

2   showed his "promise of attaining a national reputation" (*see* Tenure Guidelines) so

3   clearly that anyone who voted against him must have done so out of discrimination.  (Plf.

4   Resp. at 13-16.)  Dr. Hargrave focuses mainly on the significance of his AMR article.

5   (*Id.*)  According to Dr. Hargrave, the *Academy of Management Review* ranks 1 out of 111

6   business journals and 1 out of 173 management journals.  (Rankings.)  Dr. Hargrave's

7   AMR article had been cited 159 times by 2011, and 229 times by 2012.  (2011 Dossier;

8   Gautshi Decl. Ex. 4 ("2012 Dossier").)  Dr. Laverty testifies that "[t[hat number is

9   remarkably large for a paper authored by an assistant professor five years into an

10  academic career.")  (Laverty Decl. ¶ 8.)  Two external reviewers, who were selected from

11  Dr. Hargrave's area of management expertise, praised the significance of the article.

12  (*See, e.g.*, 2011 External Reviews. at 17 ("The 2006 AMR paper is simply outstanding

13  and has made a major impact on the field."), 2012 Reviews at 61 ("Since his paper was

14  published, at least 5 papers in top journals have built upon his work.").)  Dr. Hargrave

15  argues that the other Business School faculty should have deferred to the "management"

16  scholars' appreciation of his article.  (*See, e.g.*, Collins Dep. at 3:14-23 ("[W]e thought it

17  was a seminal piece."), 17:6-19:7 (P&T Committee member stating that he deferred to

18  external reviewers' assessments of the candidate's research record because "they are

19  probably more familiar than anybody with the direction of a field and the caliber of

20  material that comes their way").)  Dr. Hargrave also claims that he is listed as lead author

21  on the AMR article.  (*See* Van de Ven Decl. ¶ 6; *but see* Hargrave Dep. at 169:13-25

22  (describing the different naming conventions applied to scholarly articles).)

1    In a similar vein, Dr. Hargrave contends that his Business Quarterly article and

2    book chapters deserved more recognition from the faculty.[12]  (*See* Laverty Decl. ¶ 9

3    (stating that Business Ethics Quarterly is "the premier journal in business ethics" and that

4    the faculty should have deferred to P&T Committee's outside member's high view of the

5    article, because that member is one of the most cited business ethicists); Nye Decl. ¶ 8

6    (vouching for the quality of the Business Ethics Quarterly journal, as well as for the

7    publisher of the books for which Dr. Hargrave co-authored two chapters);  Rankings

8    (showing that The Oxford University Press, in which Dr. Hargrave published a chapter

9    co-authored with his dissertation advisor in 2004, is the highest quality academic

10   publisher  in the field of political science, and showing that Business Ethics Quarterly is

11   ranked 2 among 50 ethics journals and 16 among 111 business journals); 2011 External

12   Reviews (one reviewer praising the book chapters); 2012 External Reviews (same)).

13   Dr. Hargrave shows that, in contrast, his comparators articles were published in

14   arguably lower-ranking journals:  according to Dr. Hargrave's source, Dr. C's highest

15   publications rank 5 and 6 out of 91 finance journals; Dr. B's highest publication ranks 11

16   out of 111 business journals and 18 out of 173 management journals; and Dr. A's highest

17   publication ranks 131 out of 333 economics journals. (Rankings.)  According to Google

18

19   _____

     [12] Dr. Hargrave also relies on the fact that he received "meritorious" ratings for teaching and

20   research on some of his annual performance reviews.  (Gautschi Decl. Ex. 9 ("Perform. Reviews")).  That
     fact cuts both ways.  First, by 2011, Dr. Hargrave received a "non-meritorious" rating for research.

21   (Krishnamurthy Decl. ¶ 3.)  Moreover, Drs. Balakrishnan. Shankar, and Krisnamurthy participated in his
     previous positive reviews.  (*See* Perform. Reviews.)  Positive employment decisions, such as performance
     reviews, made by the same actors who later made adverse employment decision against a plaintiff give

22   rise to a weak inference *against* bias on the part of those actors.  *See E.E.O.C. v. Boeing Co.*, 577 F.3d
     1044, 1051-52 (9th Cir. 2009).

ORDER- 24

1   Scholar, Dr. A's papers had received a total of only 31 citations as of May 2015.

2   (Gautschi Decl. ¶ 4.)  Nonetheless, Defendants supported the comparators' candidacies.[13]

3   (*See generally* Dean Comp. Letters.)

4        In response, Defendants argue that although they duly weighed Dr. Hargrave's

5   journal rankings and Google Scholar citations, those are but two factors to be considered,

6   and are therefore not dispositive of the tenure decision.  (*See* Def. Reply; 2011 Letter

7   ("By objective citation measures and reputation, the *Academy of Management Review* is

8   the leading journal in management. . . . External reviewers noted that the volume of

9   citations for this paper was unusual for someone in [Dr. Hargrave's] career.")

10  Defendants identify other reasons that the faculty relied on to determine that Dr.

11  Hargrave's qualifications were inferior to those of his comparators.  (*See* 2011 Letter;

12  2012 Letter.)  Specifically, Dr. Hargrave had a low scholarly output as of 2011:  only two

13  articles in peer-reviewed journals, plus two book chapters, which the faculty found to be

14  less rigorous and prestigious than journal articles.  (Hargrave CV; 2011 Dean Rec.; 2011

15  Letter.)  The faculty was concerned about Dr. Hargrave's apparent reliance on his

16  dissertation advisor:  Dr. Hargrave's best article had been co-authored with his advisor,

17  as had both of his book chapters (one of which dated back to 2004, before Dr. Hargrave

18  graduated  and began working for the University).  (2011 Chancellor Letter; 2012

19  Chancellor Letter.)  Since then, Dr. Hargrave had authored only one article (which was

20

21  [13] Tenure review at the Business School is not a zero-sum game:  "During the promotion and
    tenure review process . . . , candidates are not being compared to one another and they are not competing
    against each other for a finite number of spots."  (Krishnamurthy Decl. ¶ 6.)  Therefore, the relevant

22  question is whether Hargrave was clearly entitled to promotion along with—not instead of— his
    comparators.

ORDER- 25

1  on the topic of business ethics rather than institutional theory) on his own.  (*See* Hargrave

2  CV.)  The faculty was also concerned about the downward trend in quality in Dr.

3  Hargrave's articles:  although the faculty gave Dr. Hargrave one year to publish his two

4  publications under review, only one was eventually published, and in a lower quality

5  journal than Dr. Hargrave's other two articles.  (2012 Letter; 2012 Dean Rec.)  In 2012,

6  even faculty who Dr. Hargrave admits were not biased against him voted against granting

7  him tenure.  (*See* Hargrave Dep. 169:9-12 (testifying that the Council did not

8  discriminate against him); 2012 Council Letter  ("Despite early success with a high

9  impact publication, the record indicates that Dr. Hargrave has yet to establish a

10  substantial research program independent of his research advisor and commensurate with

11  the expectations of the [Business School].").)

12      In contrast, the faculty recommended Dr. A because, during the tenure process, he

13  published two additional articles, including one in "one of the two most influential

14  journals in the field."  (*See* Cameron Decl. Ex. D (email telling the Provost about the

15  recent publications); Comparator CVs; Dean Comp. Letters.)  The faculty recommended

16  Dr. C because he had over 15 years of teaching experience as a professor at other

17  institutions, including the University of Notre Dame; the Business School needed to fill a

18  vacancy in its accounting department; and two of his six articles had been published in

19  high ranking journals in the last five years.  (VC Comp. Letters; Dean Comp. Letters;

20  Krishnamurthy Dep. at 109:20-111:11.)  The faculty initially recommended Dr. B

21  because she was a "master teacher" and because the quality of her research trajectory was

22  improving.  (Dean Comp. Letters (stating that "her research trajectory is noticeably

1  higher and that convinces me of her sustained contribution on the research front");

2  Balakrishnan Dep. at 50:19-51:13 (stating that he supported Dr. B's candidacy because

3  she persevered and achieved success with a publication in one high quality journal); Sen

4  Dep. at 11:18-12:17 (noting that Dr. B's articles were improving in quality, and she

5  currently had five under submission).)  The University, however, ultimately postponed

6  her tenure decision, for the same reasons that it postponed Dr. Hargrave's:  to give her a

7  year to obtain more publications.  (VC Comp. Letters).

8  **3.  Sex and age discrimination claims**

9  Viewing that evidence in the light most favorable to Dr. Hargrave, the court can

10  only conclude that "[a]lthough their relative suitability for the job is debatable, no

11  reasonable factfinder would find that [Dr. Hargrave's] qualifications are 'clearly

12  superior' to those of [his comparators]."  *Peters v. Shamrock Foods Co.*, 262 F. App'x

13  30, 33 (9th Cir. 2007).  Dr. Hargrave's and his comparators' credentials are similar to a

14  first approximation:  for example, they all have doctorate degrees, and they all published

15  between four and six scholarly articles prior to their tenure decisions.  For one of his four

16  articles, Dr. Hargrave identifies two metrics in his favor:  the number of citations, and

17  quality of the journal.  Defendants, however, identify a host of other reasons Dr.

18  Hargrave's qualifications are not superior.  Dr. Hargrave does not explain why his

19  selected metrics should trump the University's considerations.  (Particularly damaging to

20  Dr. Hargrave's theory is the fact that faculty he admits were unbiased nonetheless voted

21  against granting him tenure.)  *See*  Hargrave Dep. at 169:9-12 (admitting that the Campus

22  Council did not discriminate against him), 33:23-25 (admitting that Dr. Miller did not

1   discriminate against him on the basis of race or national origin); (Cameron Dep. 59:24-

2   60:19 (testifying that, when considering Dr. Hargrave's tenure candidacy, she was

3   unaware of Dr. Hargrave's race, national origin, or age); Stip. Dismissal (voluntarily

4   dismissing  Dr. Miller and Ms. Cameron from the suit).  The evidence simply does not

5   bear out Mr. Hagrave's claim that his academic credentials were so superior that anyone

6   voting against him *must* have been discriminating.  (Plf. Resp. at 4; Hargrave Dep. at

7   57:4-13.)  To the contrary, the evidence admits of nothing more than a difference of

8   academic opinion:  Defendants valued Mr.  Hargrave's accomplishments less than did

9   other Business School faculty.[14]  *Elsayed Mukhtar*, 299 F.3d at 1067 (finding that the

10  plaintiff's "racial discrimination case [was] a disagreement among academic

11  professionals, which is something that Title VII does not proscribe").

12          In short, this situation raises precisely the "subjective judgments on scholarship

13  that neither courts nor juries are well qualified to make."  *Id.*; *Peters*, 262 F. App'x at 33.

14  The court therefore finds that Dr. Hargrave's evidence of his scholarly qualifications,

15  standing alone, is insufficient to show pretext on the part of the University.  *See Raad*,

16  323 F.3d at 1194.  Dr. Hargrave, however, has put forth no other evidence showing that

17  the University's decision was a pretext for age or sex discrimination.  (*See generally* Plf.

18  Resp.)  Therefore, summary judgment on those claims is proper.  *See Mondero*, 400 F.3d

19  at 1213.

---

20

21  [14] Dr. Hargrave's complaint that only the "management" faculty fully appreciated his AMR article and work on institutional management theory is misguided:  the University tenure system requires every candidate to be judged by the professors superior to them in their department—not just the

22  professors in their area of specialty.  (*See* Faculty Code § 24-52.)

ORDER- 28

1    Moreover, even if Dr. Hargrave's qualifications evidence raised a question of fact

2    with respect to pretext, summary judgment on his sex discrimination claim would be

3    proper for two additional reasons.  First, Dr. Hargrave's evidence of a comparator whom

4    the University treated differently on the basis of sex is particularly weak.  Although the

5    Business School faculty voted in favor of the only alleged female comparator, Dr. B, the

6    University ultimately postponed her tenure decision for a year due to doubts about her

7    scholarly output—just like Dr. Hargrave.  (Cameron Decl. ¶ 8; VC Comp. Letters.)

8    Second, Dr. Hargrave failed to plead a sex discrimination claim against the

9    University in his complaint.  (*See* Am. Compl.).  Nor did Dr. Hargrave raise sex

10   discrimination in his EEOC complaint.  (*See* EEOC Compl.); *Freeman*, 291 F.3d at 636

11   (holding that timely filing an EEOC complaint is necessary to exhaust remedies, a

12   prerequisite to bringing a Title VII claim).  Dr. Hargrave is not permitted to raise claims

13   not asserted in his complaint.  *Grass v. Cnty. of L.A.*, 328 F.3d 1192, 1197 (9th Cir. 2003)

14   (upholding district court's refusal to permit plaintiff to raise claims on summary

15   judgment when he had not asserted those claims in the earlier stages of litigation because

16   "[t]he decision whether to permit . . . a belated attempt to expand a complaint lies within

17   the discretion of the district court").[15]

18   //

19   

---

20   [15] The deadline to amend pleadings was five months ago.  (Sched. Ord. (Dkt. # 19).)  Defendants
     pointed out that Dr. Hargrave had not asserted a sex discrimination claim against the University over a
21   year ago, when they filed their motion to dismiss.  (MTD (Dkt. # 14).)  Dr. Hargrave has not shown
     diligence or good cause for failing to amend his complaint.  *See Johnson v. Mammoth Recreations, Inc.*,
     975 F.2d 604,608-09 (9th Cir. 1992).  Accordingly, the court will not permit him to raise a claim for sex
22   discrimination against the University one month before trial.  (*See* Sched. Ord.)

1    For those reasons, also, Dr. Hargrave's sex discrimination claim fails.  In addition,

2  because aiding and abetting sex discrimination is the only claim that Dr. Hargrave has

3  raised against Dr. Sen (*see* Am. Compl. ¶ 91), the court dismisses Dr. Sen from the suit.

4  *See Grass*, 328 F.3d at 1197.

5    **4.  Race and national origin discrimination**

6    With respect to his race and national origin discrimination claims, Dr. Hargrave

7  contends that evidence in addition to his qualifications shows that the University's

8  reasons for denying him tenure were pretextual.  (Plf. Resp. at 32.)  Specifically, in one

9  paragraph of of his 40-page responsive brief, Dr. Hargrave contends that Indian faculty

10  show favoritism towards professors of Indian background.  Dr. Hargrave contends that

11  their discrimination against his candidacy influenced the final tenure decision.  (*Id.*); *see*

12  *also Lam v. Univ. of Haw.*, 40 F.3d 1551, 1560 (9th Cir. 1994), *as amended* (Nov. 21,

13  1994), *as amended* (Dec. 14, 1994) (noting that bias by a single influential faculty

14  member at an initial stage can taint the outcome of the tenure process).

15    Dr. Hargave's additional evidence is as follows:  Drs. Nye and Laverty testify that,

16  during the faculty meetings, Drs. Sen, Balakrishnan, Krishnamurthy, and Shankar argued

17  vigorously against granting Dr. Hargrave tenure.  (Nye Decl. ¶¶ 4-9; Levarty Decl. ¶¶ 10-

18  14.)  Drs. Nye and Laverty testify that the faculty did not undertake a fair evaluation of

19  Dr. Hargrave's record because "[f]rom the outset, the faculty discussion focused more on

20  building a case against tenure than on fairly and objectively evaluating Dr. Hargrave's

21  record."  (Nye Decl. ¶ 10a; Laverty Decl. ¶¶ 10-14.)  Drs. Nye and Laverty testify that,

22  during the meetings, Drs. Sen, Balakrishnan, Krishnamurthy, and Shankar ignored or

1  overlooked the requirements for tenure and promotion set forth in the Faculty Code and

2  Business School's Tenure Guidelines, including, for example, refusing to discuss Dr.

3  Hargrave's success in teaching and student development, or the significance of his book

4  chapters.  (Nye Decl. ¶ 10b; Levarty Decl. ¶ 10-14.)  Dr. Nye concludes:  "This was the

5  most extreme breach of process in a tenure case that I have observed in twenty years at

6  the University of Washington."  (Nye Decl. ¶ 10.)

7         Dr. Hargrave also complains that Dean Krishnamurthy "sabotaged" his candidacy

8  because the Dean's letters to the Vice Chancellor summarizing the faculty process were

9  inaccurate and unfairly emphasized the flaws in his candidacy rather than his strengths.

10  (Plf. Resp. at 4, 17-20.)  The only potential inaccuracy Dr. Hargrave identifies, however,

11  is that the Dean stated the faculty found the quality of Dr. Hargrave's Business Quarterly

12  article to be "good" rather than "high quality," as was Dr. Laverty's opinion, and found

13  Dr. Hargrave's teaching to be "good" rather than "excellent," as was Dr. Holland's

14  opinion.  (*Id.* at 17.)  The court notes that, inasmuch as the remainder of the faculty

15  agreed that the referenced qualities were "good" rather than "high quality" or "excellent,"

16  the letter is not inaccurate.

17         The court finds that this additional evidence, viewed in the light most favorable to

18  Dr. Hargrave, is still insufficient to raise a genuine question of fact regarding pretext.  A

19  "reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that

20  the reason was false, *and* that discrimination was the real reason."  *St. Mary's Honor Ctr.*,

21  509 U.S. at 515.  It is not enough that a factfinder could reasonably find that Drs. Sen,

22  Balakrishnan, Krishnamurthy, and Shankar opposed Dr. Hargrave's tenure candidacy

vigorously, even to the point of breaching the ordinary tenure review process and

misapplying the Faculty Code.  *See Reeves*, 530 U.S. at 150.  Opposition, without more,

does not establish pretext; there must be some indication that the *reason for the*

opposition was discrimination.[16]  *See St. Mary's Honor Ctr.*, 509 U.S. at 515.  Although

---

[16] Dr. Hargrave seeks to offer evidence regarding certain hiring decisions by the Business School that allegedly indicate a bias in favor of Indian professors.  Specifically, Dr. Laverty recalls that Drs. Krishnamurthy, Balakrishnan, and Sen championed the hiring of an Indian professor who Dr. Laverty felt was not qualified, and who has since received negative student reviews.  (Laverty Decl. ¶ 18.)  Second, Dr. Nye reveals that when Dean Krishnamurthy and Dr. Sen supported Dr. C as a lateral hire, they promised that faculty would have a chance to review his teaching skills before voting on tenure.  (Nye Decl. ¶ 14.)  Contrary to that promise, Dr. C was excused from teaching during his first two quarters.  (*Id.*)  Dr. Nye claims that process was "unprecedented."  (*Id.*)  Since then, Dr. C has received some of the "worst" student evaluations that Dr. Nye has "ever seen."  (*Id.*)  Third, Dr. Laverty recalls that, shortly after denying Dr. Hargrave tenure, Dr. Krishnamurthy recruited him to lobby for the immediate hiring of another Indian professor, who had not even been interviewed.  (*Id.* ¶ 19.)  Fourth, Dr. Nye objects to the hiring of Dr. Shankar without a national search to fill the position.  (Nye Decl. ¶ 16).

The court, however, does not rely on the hiring evidence in reaching its summary judgment decision.  "A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)).  Defendants' currently pending motion in limine moves to exclude the hiring evidence under Federal Rule of Evidence 403.  (*See* MILs (Dkt. # 87).)  In general, discrimination by an employer against noncomparators can be admissible to show, among other things, intent to discriminate.  *See, e.g.*, *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008); *Lyons v. England*, 307 F.3d 1092, 1110-11 (9th Cir. 2002).  Such evidence, however, is subject to a "fact-intensive, context-specific" inquiry under Rule 403 to determine whether its probity is outweighed by unfair prejudice, undue delay, confusion, or wasting time.  *Sprint/United Mgmt. Co.*, 552 U.S. at 388.  Accordingly, the Ninth Circuit has upheld the exclusion of evidence regarding the treatment of other employees in situations dissimilar to the plaintiff's based on the evidence's tendency to confuse the jury and waste trial time on ancillary issues.  *See, e.g.*, *Tennison v. Circus Circus Enterprises, Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (excluding testimony regarding the treatment of other employees because it would result in a series of "mini-trials" that distracted from the main issues); *Freeman v. Astrue*, 405 F. App'x 148, 151-52 (9th Cir. 2010) (same).

Here, the hiring evidence has a limited relevance to Dr. Hargrave's claims of race and national origin discrimination.  The record shows that a decision to hire a professor for a three-year term is subject to different criteria, scrutiny, and considerations than a decision to award life tenure.  (*See* Faculty Code §§ 25-51; 25-41; 24-54; Cauce Dep. at 22:21-23:4, 31:18-32:6; Kostrinsky Decl. (Dkt. # 70) ¶¶3-4.)  Moreover, the hiring decisions do not show discrimination *against* any professor on the basis of race or national origin.  Finally, for each hiring decision, Defendants are entitled to put forth evidence concerning the Indian professor's and other candidates' qualifications, the role the professor was recruited to fill, and the relevant University policies, to explain why the decision was unbiased.  (*See, e.g.*, Kostrinsky Decl. ¶¶ 3-4 (explaining that the University waived national searches for the third and fourth candidates pursuant to the "spousal hire" policy); Def. Reply at 10-12 (explaining that the first and fourth candidates were confirmed by such a large majority of the faculty that Defendants' votes were

1  Dr. Hargrave disagrees with their negative opinions of his scholarly merit, Title VII does

2  not proscribe such opinions.  Dr. Hagrave's evidence provides no indication that Drs.

3  Sen, Balakrishnan, Krishnamurthy, and Shankar were motivated by Dr. Hargrave's race

4  or national origin.  No factfinder could reasonably find otherwise.  *See Reeves*, 530 U.S.

5  at 150.  Accordingly, the court grants Defendants' motion for summary judgment on the

6  racial and national origin discrimination claims.

7  **C.      Aiding and abetting claims**

8          Having resolved the claims against the University, the court now turns to the

9  claims against the individual defendants.  The WLAD establishes liability for aiding,

10  abetting, encouraging, or inciting the commission of discrimination on the basis of race,

11  age, sex, or national origin.  RCW 49.60.220.  Dr. Hargrave is unable to establish an

12  underlying unfair practice that the individual defendants aided and abetted.  Specifically,

13  Dr. Hargrave has only brought a claim for direct employment discrimination against the

14  University.  (Am. Compl. ¶¶ 86-87.)  As discussed above, however, Dr. Hargrave has

15  failed to put forth sufficient evidence to establish a genuine issue of material fact as to

16  whether the University's denial of tenure constituted improper discrimination on the basis

17  of age, race, national origin, or sex.  *See supra* § III.B.  Without an underlying act of

18

19  inconsequential to the outcome); Krishnamurthy Dep. at121:1-22 (explaining that it is standard Business
   School policy to offer new professors teaching reductions in their first year.)  A trial would quickly
   devolve into a series of "mini-trials" over each hiring decision, which would only serve to distract the jury
20  from the salient issue in the case (Dr. Hargrave's tenure decision) and unnecessarily lengthen a trial
   already subject to a voluminous record (*see generally* Dkt. (several hundreds of pages of exhibits filed in
21  support of the parties' motions for summary judgment)).  As such, the court concludes that the limited
   probity of the hiring evidence is outweighed by its tendency to confuse the issues and cause undue delay.
   *See* Fed. R. Evid. 403; *Tennison*, 244 F.3d at 690.  Because this evidence is subject to exclusion at trial,
22  the court declines to rely on it for purposes of the summary judgment motion.  *See Orr*, 285 F.3d at 773.

1  discrimination, there can be no claim for aiding and abetting discrimination.  *See* RCW

2  49.60.220.  Therefore, Dr. Hargrave's claims that the individual defendants aided and

3  abetted the University in discriminating against Dr. Hargrave must fail.

4  **D.     Contract claim**

5          As a final matter, the court turns to Dr. Hargrave's breach of contract claim.  Dr.

6  Hargrave seizes on a single line from the Business School's tenure guidelines as basis for

7  his breach of contract claim:  "The candidate for tenure and promotion to the rank of

8  Associate Professor must show promise of attaining a national reputation."  (Tenure

9  Guidelines.)  Dr. Hargrave maintains that this sentence forms a binding contract between

10  tenure candidates and the University; the University breached this contract by failing to

11  adequately consider Dr. Hargrave's "promise of attaining a national reputation" when

12  considering his tenure applications; if the University had properly considered the matter,

13  it could only have correctly concluded that Dr. Hargrave had shown promise of attaining

14  a national reputation; and, consequently, the court should award Dr. Hargrave tenure

15  immediately.  (*See* Plf. Mot.)

16          In support of his claim, Dr. Hargrave emphasizes that the written reports of the

17  Business School and other University faculty who considered his tenure applications did

18  not contain the phrase "promise of attaining a national reputation"; some of the

19  University faculty who considered his application did not explicitly testify that "promise

20  of attaining a national reputation" was a criteria they considered (instead, they referred to

21  the Faculty Code's overarching standard); and the concept of "promise of obtaining a

22  national reputation," as such, was not discussed at the Business School faculty meetings

ORDER- 34

concerning Dr. Hargrave's tenure application.  (Plf. Mot. at 1-20.)[17]  Dr. Hargrave also

puts forth evidence that some Business School professors believe he had in fact

demonstrated a "promise of obtaining a national reputation" as of his tenure reviw.

(Collins Dep. at 12:4-14:20; 3d Gaustchi Decl. Ex. 17 ("2012 P&T Rec."); Holland Dep.

at 49:8-23; 51:9-21.)

    As discussed below, Dr. Hargrave's contract claim fails for at least two reasons.

### 1.  Motion to strike

    As an initial matter, Defendants move to strike the declaration of Lea Vaughn

(Dkt. # 68) filed in support of Dr. Hargrave's reply to his motion for summary judgment.

(1st Surreply (Dkt. # 80).)  Ms. Vaughn offers factual and legal opinions as to the

interplay between the Faculty Code and the guidelines of various academic departments

within the University.  (*See* Dkt. # 68.)  As Dr. Hargrave's counsel conceded at oral

argument, Dr. Hargrave did not disclose Ms. Vaughn as either a lay or expert witness, or

provide an expert report, as required by Rule 26.  (4th Peterson Decl. (Dkt. # 81); *see*

Fed. R. Civ. P. 26(a) (requiring initial disclosure of lay and expert witnesses, as well as a

written expert report), (e) (requiring supplementation).  Federal Rule of Civil Procedure

37(c)(1) provides

> If a party fails to provide information or identify a witness as required by
> Rule 26(a) or (e), the party is not allowed to use that information or witness
> to supply evidence on a motion, at a hearing, or at a trial, unless the failure

---

[17] (Citing 2011 Letter; 2011 Dean Rec.; 2012 Letter; 2012 Dean Rec.; Laverty Decl. ¶¶ 12-13;
Nye Decl. ¶¶ 7-8; 3d Gautschi Decl. (Dkt. # 43) Ex. 10 ("Lerum Dep.") at 18:1-25 (testimony by Campus
Council member not mentioning that "promise of attaining a national reputation" was a Business School
requirement for tenure); Cameron Dep. at 37:1-45:11 (same); Cauce Dep. at 24:1-25:24; 2011 Council
Rec.; 2012 Council Rec.; 2011 Chancellor Letter; 2012 Chancellor Letter).)

1  was substantially justified or is harmless.

2  Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d

3  1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by

4  forbidding the use at trial of any information required to be disclosed by Rule 26(a) that

5  is not properly disclosed."). Dr. Hargrave offers no explanation as to why his failure to

6  disclose Ms. Vaughn's testimony is substantially justified or harmless. Trial in this case

7  is looming one month away. (Dkt. # 19.) There is inadequate time for Defendants to

8  depose Ms. Vaughn or otherwise prepare to address her testimony. Accordingly, the

9  court strikes Ms. Vaughn's declaration pursuant to Rule 37(c). *See* Fed. R. Civ. P. 37(c);

10  *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), *as*

11  *amended* (Sept. 16, 2008) (upholding district court's exclusion of previously undisclosed

12  evidence because Rule 37 is a "self-executing, automatic sanction to provide a strong

13  inducement for disclosure of material").

14  **2. Exhaust administrative remedies**

15  Next, Dr. Hargrave's contract claim is not properly before the court because Dr.

16  Hargrave fails to exhaust his administrative remedies. "The doctrine of exhaustion of

17  administrative remedies is well established in Washington." *Citizens for Mount Vernon*

18  *v. City of Mount Vernon*, 947 P.2d 1208, 1211 (Wash. 1997). The rule provides that "in

19  general an agency action cannot be challenged on review until all rights of administrative

20  appeal have been exhausted." *S. Hollywood Hills Citizens Ass'n for Pres. of*

21  *Neighborhood Safety & Env't v. King Cnty.*, 677 P.2d 114, 117 (Wash. 1984). The

22  University is a state agency subject to this rule. RCW 34.05.010(2), (7).

1    The exhaustion requirement applies "(1) when a claim is cognizable in the first

2    instance by an agency alone; (2) when the agency's authority establishes clearly defined

3    machinery for the submission, evaluation and resolution of complaints by aggrieved

4    parties; and (3) when the relief sought can be obtained by resort to an exclusive or

5    adequate administrative remedy." *S. Hollywood Hills*, 677 P.2d at 117-18 (internal

6    punctuation omitted).  Dr. Hargrave does not dispute that the exhaustion requirement

7    applies to his contract claim against the University.  (*See* Plf. Mot.; Plf. Reply (Dkt.

8    # 66).)  The court agrees that the three elements are met. *See S. Hollywood Hills*, 677

9    P.2d at 117-18.  First, the Faculty Code establishes a comprehensive procedure for

10   reviewing faculty decisions.  (Faculty Code § 28.)  That procedure includes review by a

11   Faculty Adjudication Panel Chair; a hearing before a Hearing Panel of five to seven

12   faculty members that takes evidence and renders a written decision on the challenge; and

13   the opportunity to appeal the Panel's decision to the University President.  (*Id.* § 28-61.)

14   Second, the Faculty Code requires that parties challenging faculty decisions "shall avail

15   themselves of these proceedings prior to seeking review beyond the University."  (*Id.*)

16   Third, the Hearing Panel found that it could "clearly" award Dr. Hargrave's alternative

17   request for relief in the form of another tenure review.  (Chair Letter at 2; Petition); *see*

18   *Dioxin/Organochlorine Ctr. v. Dep't of Ecology*, 837 P.2d 1007, 1016 (Wash. 1992)

19   (finding that the ability to obtain partial relief was sufficient to require exhaustion of

20   administrative remedies).  Therefore, the exhaustion requirement applies.

21   It is undisputed that Dr. Hargrave voluntarily withdrew from the University

22   appeals process after he received unfavorable preliminary discovery rulings.

1  (Withdrawal Letter.)  Dr. Hargrave contends that he was not required to finish exhausting

2  his appeal because those rulings rendered his appeal futile.  (Plf. Reply.)  Dr. Hargrave is

3  correct that "[t]here are exceptions to the exhaustion doctrine based upon considerations

4  of fairness or practicality."  *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d

5  298, 300 (Wash. 1989).  "One such exception is recognized where pursuing the available

6  remedies would be futile."  *Id.*  "The futility exception to the exhaustion doctrine is

7  premised upon the rationale that courts will not require vain and useless acts."  *Orion

8  Corp. v. State*, 693 P.2d 1369, 1379 (Wash. 1985).  "If the available administrative

9  remedies are inadequate, or if they are vain and useless, they need not be pursued before

10  judicial relief is sought."  *Id.*  "Generally, futility addresses a showing of bias or prejudice

11  on the part of discretionary decisionmakers."  *Baldwin*, 769 P.2d at 300; *see also*

12  *Dioxin/Organochlorine*, 837 P.2d at 1016 (noting that an administrative process is futile

13  when a legislative or agency policy predetermines the result of the plaintiff's

14  administrative claim).

15      Contrary to Dr. Hagrave's assertion, however, the appropriate inquiry is not

16  whether a plaintiff believes he is likely to prevail on his administrative claim.  *See

17  Lechelt v. City of Seattle*, 650 P.2d 240, 242 (Wash.  1982) ("Even remedies thought to

18  be unavailing must be pursued.").  Rather, the inquiry is whether fairness or practicality

19  to a plaintiff outweighs the policies underlying the exhaustion requirement.  *See S.

20  Hollywood Hills Citizens*, 677 P.2d at 117.  The policies underlying the exhaustion

21  requirement are:  to "(1) insure against premature interruption of the administrative

22  process; (2) allow the agency to develop the necessary factual background on which to

1   base a decision; (3) allow exercise of agency expertise in its area; (4) provide for a more

2   efficient process; and (5) protect the administrative agency's autonomy by allowing it to

3   correct its own errors and insuring that individuals were not encouraged to ignore its

4   procedures by resorting to the courts." *Citizens for Mount Vernon*, 947 P.2d at 1211

5   (quoting *McKart v. United States,* 395 U.S. 185 (1969).)  "Whether administrative

6   remedies are futile is a question for the court." *Beard v. King Cnty.*, 889 P.2d 501, 506

7   (Wash. Ct. App. 1995).

8       Dr. Hargrave puts forth three reasons he believes that continuing the University's

9   appeal process would have been futile:  the Hearing Panel (1) deferred ruling on whether

10  it had the authority to grant Dr. Hagrave tenure outright; (2) did not style his appeal as a

11  breach of contract claim; and (3) limited the depositions he could take.  (*See* Plf. Reply.)

12  The court finds that none of these reasons rendered the proceedings futile.  *See Orion*

13  *Corp.*, 693 P.2d at 1379.

14      First, the Panel never ruled against Dr. Hargrave on the issue of whether it could

15  award tenure as a remedy in Dr. Hargrave's situation.  (Plf. Reply; Withdrawal Letter.)

16  Rather, the Chair confirmed that, "the faculty code does not preclude a hearing panel

17  from ordering promotion or tenure as relief in an appropriate case—that is, where it can

18  do so without reconsidering the case for tenure on the merits."  (Chair Letter.)  The Panel

19  then declined to decide whether it could award tenure in Dr. Hargrave's case prior to the

20  hearing in the case because such a ruling would be "entirely speculative at this time and,

21  hence, premature."  (2d Gautschi Decl. Ex. 6 ("2d Pre-Hearing Order").)

22  //

1    Dr. Hargrave fails to explain how leaving open the possibility that he could be

2    awarded tenure at the conclusion of his administrative claim rendered the process "vain

3    and useless." *Orion Corp.*, 693 P.2d at 1379.  After all, even if the Hearing Panel

4    ultimately concluded it could not award tenure outright, it was already established that

5    the Panel could award Dr. Hargrave's alternative requested relief:  another tenure review

6    that comported with the Faculty Code.  (Chair Letter); *Dioxin/Organochlorine*, 837 P.2d

7    at 1016.  That second review could very well have led to an award of tenure.

8    More important, even if resolution of administrative process did not provide Dr.

9    Hargrave his optimal solution, it would have served the policies underlying the

10   exhaustion requirement, namely, to "allow exercise of agency expertise in its area;" and

11   to "protect the administrative agency's autonomy by allowing it to correct its own

12   errors." *Citizens for Mount Vernon*, 947 P.2d at 1211.  The requirement to exhaust

13   administrative remedies "is founded upon the belief that the judiciary should give proper

14   deference to that body possessing expertise in areas outside the conventional expertise of

15   judges." *Citizens for Mount Vernon*, 947 P.2d at 1211.  That principle is especially

16   significant where, as here, the court is asked to review "academic tenure decisions [that]

17   involve subjective judgments on scholarship that neither courts nor juries are well

18   qualified to make." *Elsayed Mukhtar*, 299 F.3d at 1067.  The Hearing Panel was better

19   qualified to determine whether the University faculty botched Dr. Hargrave's review

20   process, or based their decision on impermissible, non-academic factors.  Moreover, the

21   Hearing Panel had the authority to rectify any impropriety it found.  Therefore, the

22   Panel's deferral of the question of the potential remedies is not a basis for futility.

ORDER- 40

1    Second, Dr. Hargrave complains that the Panel did not rule on whether his appeal

2  was a "breach of contract claim" against the University, as he asserted, or an action for a

3  breach of the Faculty Code, as the University asserted.  (Plf.  Reply at 10; Withdrawal

4  Letter; *see also* 2d Gautshi Decl. Ex. 5 ("1st Pre-Hearing Order") (inviting the parties to

5  provide their proposed formulation of the issues to the Hearing Panel); 2d Pre-Hearing

6  Order (identifying a statement of issues without adopting one or the other parties'

7  positions).)  Dr. Hargrave fails to establish why the distinction makes any difference.

8  The Hearing Panel determined that one of the issues to be determined was, "Did any

9  authorized University official, through action or inaction, violate University regulations

10  affecting the terms, conditions, or course of employment of [Dr. Hargrave]?" (2d Pre-

11  Hearing Order.")  As such, regardless of what nominal title the Hearing Panel applied to

12  Dr. Hargrave's appeal, the Hearing Panel was poised to decide the substance of Dr.

13  Hargrave's "breach of contract" claim:  whether the Faculty Code had been violated.

14  (*See id.*)  Such a decision would have advanced at least the policies of allowing the

15  exercise of University expertise in its area, providing for a more efficient process, and

16  protecting the University's autonomy by allowing it to correct its own errors.  *See*

17  *Citizens for Mount Vernon*, 947 P.2d at 1211.  Therefore, the disagreement over the

18  nominal title of Dr. Hargrave's administrative claim is not a basis for excusing the

19  requirement to exhaust remedies.

20    Third, Dr. Hargrave complains about certain discovery orders made by the

21  Hearing Panel.  Specifically, Dr. Hargrave finds unfairness in the fact that the Panel

22  declined to permit him to depose or obtain the hiring notes of faculty not named as

1  respondents in the administrative action.  (Plf. Reply at 10-11; Withdrawal Letter.)

2  However, in its preliminary ruling denying permission to depose certain faculty, the

3  Panel explicitly invited Dr. Hargrave to explain why he sought to take those depositions.

4  (*See* 2d Pre-Hearing Order ("[E]ven if it is assumed that the professors Balakrishnan and

5  Sen opposed Professor Hargrave's candidacy, it is not clear why it is necessary or even

6  useful to take their depositions given that they are not respondents whose actions are

7  being challenged.  If [Dr. Hargrave] continues to seek to take these . . . depositions, he

8  should provide written statements in support of the request within seven days of this

9  Order.").)  Dr. Hargrave failed provide a statement in support of his request.  (2d.

10 Cameron Decl. (Dkt. # 86) Ex. A ("Discovery Ruling") ("Petitioner did not provide such

11 a statement and has offered no additional reasons supporting the taking of depositions of

12 Professor P.V. Balakrishnan and Professor Pradyot Sen.").  Dr. Hargrave may not now

13 criticize the Hearing Panel's ruling on an issue that he refused to contest.

14        Additionally, the Panel is vested with statutory discretion to determine the

15 appropriate discovery procedures applicable to an administrative proceeding.  RCW

16 34.05.446.  The Panel permitted Dr. Hargrave to take the deposition of Dean

17 Krishnamurthy and to engage in documentary discovery; Dr. Hargrave also received

18 University records related to his tenure review process.  (*See* Discovery Ruling; 2d Pre-

19 Hearing Order (requiring the University to supply notes from the Business School faculty

20 meetings).)  There is no indication that the discovery process overall was unfair or

21 otherwise hindered Dr. Hargrave's presentation of his administrative claim.  A plaintiff's

22 subjective belief regarding the unfairness of the administrative procedure is insufficient

1   to establish futility.  *See Baldwin*, 769 P.2d at 301 (1989); *Buechler v. Wenatchee Valley*

2   *Coll.*, 298 P.3d 110, 117 (Wash. Ct. App. 2013; *Beard*, 889 P.2d at 506 (requiring

3   plaintiffs to apply for a promotion even though employer verbally told them that he

4   would not consider them for promotion because plaintiffs "cannot ask the court to

5   remedy a denial of promotions for which they never applied based on speculation that

6   seeking promotion was futile").  Therefore, the discovery rulings did not render the

7   administrative appeal proceedings futile.

8         In sum, "[f]utility that will excuse exhaustion arises only in rare factual

9   situations."  *Buechler*, 298 P.3d at 117.  Dr. Hargrave's is not such a situation.  Because it

10  is undisputed that Dr. Hargrave failed to complete his administrative appeal with the

11  University, the breach of contract claim is not properly before the court.  *See Beard*, 889

12  P.2d at 506.  Accordingly, summary judgment on the breach of contract claim is

13  appropriate.

14        **3.  Merits of the contract claim**

15        Finally, summary judgment would be appropriate even if Dr. Hargrave were not

16  required to exhaust administrative remedies prior to bringing a contract claim before this

17  court.  The parties dispute the legal effect of the Business School's tenure guidelines.  Dr.

18  Hargrave contends that the guidelines contractually obligate the University to evaluate

19  his tenure application for a "promise of obtaining a national reputation" and to award him

20  tenure if he shows such promise.  (*See* Plf. Mot. at 21 (citing *Storti v. Univ. of*

21  *Washington*, 330 P.3d 159, 163 (Wash. 2014); Tenure Guidelines.)  The University

22  contends that the Business School's tenure criteria merely provide examples of how

1  Business School candidates can show they have met the Faculty Code's requirements for

2  tenure and promotion, namely, "a record of substantial success in both teaching and

3  research." (Def. Resp.; Def. Surreply (Dkt. # 85).)  The court finds it unnecessary to

4  decide the issue of whether the guidelines constitute a unilateral contract between Dr.

5  Hargrave and the University because, even if they did, Dr. Hagrave's breach of contract

6  claim would fail.

7       First, the plain language of the tenure guidelines does not guarantee that a

8  candidate who shows a promise of obtaining a national reputation will be awarded tenure.

9  Rather, the guidelines require that "[t]he candidate for tenure and promotion to the rank

10  of Associate Professor must show promise of attaining a national reputation." (Tenure

11  Guidelines.)  The guidelines go on to list additional requirements:  "there must be a base

12  of publications in high-quality refereed journals"; "[t]here must be evidence of effective

13  teaching in the various courses the candidate teaches regularly"; and "[h]ow well one

14  performs in service assignments is an important criterion." (*Id.*)  As such, a promise of

15  attaining a national reputation is a necessary, but not sufficient, condition for promotion

16  and tenure.

17       Second, the record admits of only one conclusion:  the University considered the

18  criteria set forth in the Business School guidelines and Faculty Code.  The tenure

19  guidelines explain the factors that indicate a promise of attaining a national reputation:

20       "Letters from external reviewers are extremely important, as is the
        reputation of the reviewers.  Any other evidence to indicate the quality of
21       the research, such as the quality of journals in which publications appear,
        citations, awards, etc., is also valuable.  A number of different types of
22       scholarly contributions are valued (grants, book chapters, presentations,

etc.), but there must be a base of publications in high-quality refereed journals."

(Tenure Guidelines.)  In his briefing, Dr. Hargrave contends that a similar list "objective measures" demonstrate whether a candidate has shown promise of attaining a national reputation, including, the quality and reputation of journals in which the candidate's papers appear; assessments by external reviewers; the candidate's service as a referee at quality journals; the candidate's presentations at seminars, workshops, and professional conferences; and citations to the candidate's publications.  (Plf. Mot. at 14 (quoting Cauce Dep. at 37:1-45:11, 19 (citing Jeffords Dep. at 19:24-20:11, 24:1-25, 28:12-21, 31:6-19).)

The faculty's written memoranda, as well as their subsequent testimony, establishes that when evaluating Dr. Hargrave's candidacy, they considered all of the scholarly factors that Dr. Hargrave now contends establish his promise of attaining a national reputation.  (*See* Cauce Dep. at 24:1-25:24; Cameron Dep. at 37:1-45:11; Jeffords Dep. at 19:24-20:11, 24:1-25, 28:12-21, 31:6-19; Krishnamurthy Dep. at 185:12-187:2 (discussing Dr. Hargrave's ability to establish a reputation independent from that of his dissertation advisor); Sen Dep. at 68:20-25; 2011 Dean Rec.; 2012 Dean Rec.; 2011 Council Rec.; 2012 Council Rec.; 2011 Chancellor Letter; 2012 Chancellor Letter; 2012 P&T Rec.)  Moreover, the topic of national reputation was specifically raised and addressed at multiple points during the review.  The requirement for "promise of attaining a national reputation" was mentioned in the request letters sent external reviewers.  (*See* 2d Gautschi Decl. Ex. 4 (template request letter).)  Many of the external

1  reviewers addressed the subject in their reviews (*see* 2011 Reviews; 2012 Reviews).  The

2  P&T Committee's 2012-13 recommendation expressly found that Dr. Hargrave had

3  established a promise of attaining a national reputation.  (2012 P&T Rec.).  Moreover,

4  Dr. Hargrave himself raised the issue of national reputation in his responses to the faculty

5  votes.  (2d. Krishnamurth Decl. Ex. C ("2011 Statement") (describing the ways in which

6  he had already attained a national reputation); Ex. D ("2012 Statement") (same).)  Dean

7  Krishnamurthy's 2012-13 recommendation explicitly rebutted Dr. Hargrave's contention

8  that the faculty had not applied the standard of "promise of attaining a national

9  reputation."  (2012 Dean Rec.)  Those materials discussing the national reputation

10  standard were provided to every subsequent level of review, and hence were before the

11  Campus Council, Chancellor, Vice Chancellor, Vice Provost, and Provost when they

12  made their tenure decisions.  (*See* Cauce Dep. at 31:6-32:6; Jeffors Dep. at 12:1-13:6;

13  Krishnamurthy Dep. at 171:22-24; 2d. Krishnamurthy Decl. ¶ 3.)

14       Dr. Hargrave's claim rests on the facts that the phrase "promise of attaining a

15  national reputation" does not appear in every single one of tenure review materials, and

16  that faculty members did not utter the phrase during the faculty meetings.  (*See* Plf. Mot.

17  at 1-20.)  As the preceding litany of citations shows, to the extent there was an obligation

18  to consider Dr. Hargrave's "promise of attaining a national reputation," the faculty

19  //

20  //

21  //

22  //

1    substantively fulfilled that requirement.  The absence of certain magic words from some

2    records of his tenure decision does not negate that conclusion.[18]

3         Last, Dr. Hargrave's contention that the University was prohibited from

4    considering the likely trajectory of his career is not well-taken.  Dr. Hargrave argues that

5    determining a "'record of substantial success' required an assessment of what he had

6    done in his academic career as of the reviews, not what he might do in the future."  (Plf.

7    Mot. at 24.)  This contention is particularly misguided given Dr. Hargrave's insistence

8    that he should have been awarded tenure based on his "promise of attaining a national

9    reputation"—a criterion that is necessarily forward looking.  (*See* Plf. Mot. at 1-20.)

10        The Faculty Code mandates review of "the whole record of candidates," and

11   consideration of "the way in which the candidate will fit into the present and foreseeable

12   future of the academic unit."  (2d Peterson Decl. Ex. E ("Exec. Order 45") (incorporated

13   into chapter 25 of the Faculty Code).)  In fact, Dr. Hargrave himself included evidence of

14   papers under review and works in progress in his dossiers.  (2d. Krishnamurthy Decl.

15   Exs. A ("2011 Dossier"), Ex. B ("2012 Dossier").)  The external reviewers and Campus

16   Council both relied on his evidence of future work to recommend awarding him tenure.

17   (*See* 2011 External Reviews; 2011 Council Rec.).  Dr. Hargrave cannot take issue with

18   the consideration of factors not only sanctioned by the Faculty Code, but on which he

19   affirmatively submitted evidence in his favor.  Upon closer inspection, it is evident that

20

21   ──────────────

22   [18] The court notes that Dr. Hargrave's own statement provided with his 2011-12 dossier did not
     use the phrase "promise of attaining a national reputation," and his 2012-13 statement used it only once.
     (*See* 3d Gautschi Decl. Ex. 18; 2d Krishnamurthy Decl. Ex. 1.)

ORDER- 47

1   Dr. Hargrave is less concerned with what material the faculty considered than what

2   conclusion they drew from that material:  namely, that he had not demonstrated the

3   pipeline of research necessary to merit promotion and tenure.  This line of argument is

4   just one more way in which Dr. Hargrave seeks to have the court review the merits of his

5   tenure decision under the guise of adjudicating a legal claim.  Such review is beyond this

6   court's province.  Therefore, for this and all the reasons previously discussed, summary

7   judgment is appropriate on Dr. Hargrave's breach of contract claim.

8                          **IV.    CONCLUSION**

9           For the foregoing reasons, the court GRANTS Defendants' motion for summary

10   judgment (Dkt. # 33) and DENIES Plaintiff's motion for summary judgment (Dkt. # 42).

11           Dated this 1st day of July, 2015.

12

13

14   _____
      JAMES L. ROBART
15    United States District Judge

16

17

18

19

20

21

22

ORDER- 48